This case is about Robert Moorman's conviction and death sentence for the death of his adopted mother and trial counsel's actions when he relied on a single defense in sanity and rejected the trial judge's offer to instruct the judge on the lesser-included offenses of second-degree murder and manslaughter. It's also about counsel's actions at the sentencing after his – after Mr. Moorman was convicted of first-degree murder. At sentencing, he presented only two witnesses, a prison chaplain and a prison counselor. This case is here a second time. In the earlier appeal, this Court had found that Moorman had established cause to overcome defaults the district court had imposed because appellate – because the trial counsel ineffectiveness claims had not been raised on direct appeal. What had happened was that the appellate lawyer also represented Mr. Moorman in the State post-conviction proceedings and had an obvious conflict in asserting those claims at that time. So this Court found cause because of the conflict of interest and remanded it back to the district court to determine whether we could show prejudice to overcome those defaults. I just wanted to give you that little brief background. Kagan. And the standard in establishing prejudice is what? Dora. It would be the same, a reasonable probability of a different result. So it is the same standard of prejudice. This is not a whodunit mystery. It has never been disputed that Robert Moorman's actions that night caused his mother's death. It's always been about two key facts. And the role those impairments played on the night of his adopted mother's death when they were together in a one-room hotel across the street from the prison in Florence, Arizona. Because of the role those impairments play, the issue I'd like to address first is trial counsel's failure to pursue the alternative defense that Arizona recognized under law that fit the facts so well here. And it's called a Christensen defense, which is that Robert Moorman, on the night that his adopted mother died, acted impulsively without reflection as he had consistently done. Counsel, in your view, what evidence in the record supported that defense? First of all, Your Honor, his statement to police. And this is shortly after he is arrested. He does not ask for counsel. In fact, he asks the police, do you think I ought to get counsel? And they don't say anything. And they then begin to interview him. And he tells the police, my mom made me take my dad's place and do things I couldn't handle. I popped. I lost it. I then panicked. Those are all consistent with the Christensen defense that Arizona recognizes. But, you know, the difficulty, if you look at other cases like LeGrand v. Stewart where they say there really wasn't a problem with not going with a Christensen defense because of the record, and you have all this evidence here that's pretty strong against impulsivity, such as the will and trust situation he had, that carousel, you know, the gagging, the buying of the knives, and other things. It would be helpful if you could benchmark your claim against that specific evidence. I would be happy to. The evidence that you just mentioned, again, is evidence of Robert's lifelong impairments, thought processes, thinking. The State made much about the fact that there was this will that Robert had scribbled out that they found in his cell later after the crime. Robert's mother, and he knew this, his adopted mother, was going to be moving to Oklahoma, and she had made out a will leaving her entire estate to him. It may well be, again, this is speculation. There's nothing clearly in the record, but it certainly just is likely, given Robert's impairments, that he decides he's going to make out a will, too. And he was leaving it in trust. And in the letter that he made out, he's saying it was no – there was no trust. It was you do the best you can with this or something like that with your life. So there is a difference. Yes. That's right, Your Honor. That is absolutely – that is a difference. But again, with the undisputed impairments that Mr. Mormon suffers, to think that he is sitting there thinking, okay, in trust, out of trust. And again, he is going to have a three-day furlough with his adopted mother. So it doesn't seem unusual that he's going to take a will, even though she already has one. That meeting is going to be taking place. Well, I don't see how that supports impulse. It – I was just – Yes, I understand. Answering the question. I agree. The impulsivity is based on the facts of the crime and also on other facts as well that the State has relied on that, you know, he goes to the store, and so did the district court below. He goes to the store to buy some knives. Given the impairments that Mr. Mormon suffers, it is hard to accept that he could possibly be there chatting with a store owner about some knives, all in this devious plot to have his mother back at the hotel room, bound up, and he's going to come back and cut her up. His – if you recall – Why is that any less plausible than what actually happened after the fact, when he did cut her up and then he had these pretty casual conversations with people? Now, I know that doesn't really go to his – to the murder itself, but I'm just saying I find it – it's hard to – you're sort of arguing at that point against premeditation, whereas on your Christensen defense, the question I think we need to focus on is, is there enough here that gets you over that threshold that it – one, would it have been a legitimate defense? And even if it was, would it have – is there a probability it would have changed the result? So I'm having some trouble trying to figure out how his counsel would have been able to argue that and when. Again, it would have been based on those actions of what he – his statements to the police. There – it's also based on the evidence of the – the key – sorry, I'm rambling here. Let me get more specific. The key underlying fact here is the abuse that was going on between Robert and his mother. He told a number of individuals long before this crime ever occurred. He told Elizabeth Baker that he and his mother were engaged in sexual relationships. He told his parole officer, Jesse Medrano, that he and his – well, he didn't tell his parole officer, Jesse Medrano. He had said the parole officer had observed the two of them together, became very intimate about it, had talked to Robert a little bit about it, and had said – in fact, had issued an order that Robert not be allowed to be with his mother alone. And that was an order that was given to the prison before they allowed him his release. Whatever that means. I guess what troubles – one thing I'm troubled by is the issue before us is not really whether a defense could have been – or this kind of defense could have been made, but whether his appellate counsel was deficient in not arguing that his trial counsel was ineffective for not raising it, which is a pretty stiff – a couple of additional barriers, I would suppose. In the trial counsel, if you look at what the trial counsel did, trial counsel, I thought – correct me if I'm wrong – undershook an insanity defense. Yes. That his entire case was based on an insanity defense. And that's why when you compare the insanity defense he presented that was based with on the testimony of a psychologist who said that he believed Mr. Mormon suffered a possible delusional – organic delusional syndrome. That was the best that he could give it. And that was based on his belief that he was not – he and his mother had not been long engaged in sexual relations. And so that was the sole defense. And when you look at that sole defense that has, you know, very little support and comes from him. I guess this is what I didn't understand. Is your position that – which I thought the district court seemed to think it was – that he should have maintained, in addition to the insanity defense, this impulse Christensen defense? Yes. Or is it that he shouldn't have – is that your position, or is it that he shouldn't have gone with the insanity defense at all, but which would have gotten him an acquittal and should have relied only on this? Ours is he should have – our position is he should have relied only on this. Only on this. Robert Mormon was not going to be acquitted under an insanity defense. He – that was – they didn't – they did not have the evidence. The Christensen defense, on the other hand, the evidence completely supported, as well as his past behavior. Robert is – it acts very impulsively. And you had a question? No. Then I'm back to where Judge McEwen was. The evidence doesn't all seem to support that theory. There seems to be a lot of evidence that he was thinking about this and planning it. It might help if I just tell you a little bit about the facts that occurred in Mr. Christensen's case. Mr. Christensen was the result of Arizona recognizing this defense. In that case, Mr. Christensen had recently divorced from his wife. He had then gone over to his wife's house. They had a quarrel, and he killed her. The facts that later came out was – that supported – that showed how the murder had occurred was that he had, during this quarrel, hit her over the head with a bottle and then later laid down next to her. Some time passed after that, he gets up and then strangles her. Some time after that, he then tries to get rid of all of the evidence. And they – what they wanted – what trial counsel wanted to do there was to call an impulsively in stressful situations. Those facts are not that different from Mr. Morbin's facts. This was a viable defense had he investigated it and had he not relied on a single defense of insanity. That, again, the State was able to bring in expert after expert just saying, no, based on these facts, we – he was not insane. This defense, on the other hand, was a viable defense, and it fit with everything that the witnesses that we have gathered, including historical witnesses as well, witnesses who knew Mrs. Morman and Robert back when he was a young child, and those are witnesses who have submitted declarations saying there was always something odd about this relationship. She was very withholding on giving any information about Robert to anybody. In fact, she wouldn't even provide medical information that they needed. I don't want to prejudice any of the arguments you want to make on Christensen, but I will tell you that I was far more troubled by the lesser-included offense issue than by Christensen, and would appreciate some illumination on that. I – thank you, Your Honor. I will move to that, and it is a very troubling issue, and I agree. That is, again, an important – these are important facts showing counsel's ineffectiveness. Now, what we have is a record where, at first, trial counsel asks – well, he moves for acquittal after the State's case rests, saying, you know, you haven't been able to show the elements of first-degree murder. And then after that is denied, the judge later offers to instruct the jury after, again, the evidence is in, to instruct the jury on lesser-included offenses. And the – counsel then says, well, I'd like to talk this over with my client. Now, remember, counsel wants to talk this over with his very impaired, impulsive client. So that – they take a break for the day, he comes back the next day. But the counsel – the client was not deemed incompetent, so he was presumed to be able to assist his attorney in terms of defending the case. I agree, and that's what trial counsel says in his declaration, is that I thought he was incompetent, the court found him competent, and so we proceeded. But, yes. But he nevertheless represented to the court that he was going to consult his client. He did. According to the record. That is exactly right. He did. And he comes back and he says, after consulting with him, we have decided – I have, I think it is, I have decided that we do not want the lesser-included offenses. Now, you know, we also obtained an affidavit from counsel on that very fact. And in that affidavit, counsel states that – sorry. So the issue is whether or not this was a reasonable trial strategy. That's exactly right. And he says, again, he recognizes that Mr. Mormon was obviously seriously injured. He was seriously mentally ill. He knew he had low intelligence. He knew he suffered from delusions. Remember, this is his sole defense in this case, is that he is – Mr. Mormon is insane. And he then says, after consulting with Robert, I made the decisions concerning the development and presentation of the case. He doesn't say Robert made the decisions. He said, I made the decisions. And that's not – So what's wrong with that? If he consults with his client and then he makes a decision, why wouldn't that be a reasonable tactical decision? What case authority do you have to support your argument that consulting with his client and then making the decision is less than a reasonable tactical decision? I'm sorry. I don't have a case to give you right now. I will try to think of one. But the facts of this case make it not a reasonable decision. They – he is going for insanity or nothing. And possibly if he had an incredible defense for insanity, this might be a different case. But he did not have that. Well, in hindsight, maybe not. But looking at it at the time, if – under the law at the time, if he were able to convince the jury that his client was insane, his client would be not guilty. So why wouldn't it be reasonable to shoot for a not guilty verdict as opposed to a verdict on a lesser included that would probably have the imposition of a pretty lengthy sentence in light of his past criminal history? Because – that's right. And the reason that that was not a reasonable action to take is based on the facts, that the likelihood of Mr. Mormon being acquitted of – I mean, being found insane based on these facts was slim to none. You're saying it shouldn't be a binary proposition. In other words, it's not go for broke on insanity and forget the lesser included. He could have done both consistently, rolled the dice on how they came out. That's exactly right. Now the question then becomes whether in hindsight and with the standard of review, we can determine that that was ineffective as well. Yes. And I think – I think you can determine it was ineffective assistance. Doesn't this really depend on how strong you think that evidence of premeditation is? Because the lesser included are just going to – are going to – you're going to get a verdict on them if the jury doesn't think there was premeditation. That's right. That's right. And the evidence here was – let's just assume – Well, the district court thought it was very strong. Yes. And let's just assume for a second that they were – he was successful in an insanity defense, which he would not have – and he was not, based on this record, would not have been successful. Robert Mormon was not going to be free. He is serving a – he was serving then a life without – a life with the possibility of parole on the child molestation case from – that had – for many years. He's still serving that. He was never going to walk out of that courtroom. But he would not have had the additional conviction for murder. That's absolutely right. He would not have had an additional conviction for murder. But he was going – based on these facts, he was going to be convicted of something. Well, I'm not sure which way that cuts. Because if he were to be successful in an insanity, he would be – he would be in a different environment, which may well have been a much better environment for him. But I don't know the answer.   But I don't know the answer. And, Your Honor, I'm not sure about that, given that he is still serving a life sentence on the child molestation. And I sort of well believe that was worth the tactic of trying to have him declared insane so that he could argue for the civil commitment as opposed to punishment. Why wouldn't that be reasonable? Because he's subjecting his client to what his client got, death. He's subjecting his client to a verdict of guilt, of premeditated murder, and a death sentence. Okay. Do you want to spend some time on the sentence? Yes, I did. I did. Let me move really quickly to that. Then the next claim that we believe is a very, very strong claim for this Court, again, is what happens when he has been convicted of first-degree murder, and he then goes into the penalty phase to decide the life or death sentence in this case. And counsel presents two witnesses. And they're both prison employees. And what he presents is basically skipper evidence, evidence of good conduct, that Robert gets along well in prison. And the two prison employees... Let's get to the bottom line, because we only have five minutes left. What do you think is the most important evidence, new evidence unearthed in habeas, that would change the calculus here, given the standard of review? The evidence that we have uncovered from witnesses and experts showing the extraordinary impairment that Robert suffered from birth forward. It seemed to me, though, I thought that that actually was a statutory mitigating factor that the judge credited. And then the question is, is your evidence nuance and cumulative of that, or is there something, I don't want to say, kind of materially different, so that it doesn't really just fall into that large category where the judge, in effect, gave him the statutory mitigating factor? He did, and we assume that that was based on the evidence that he had obviously presented at trial. Obviously, even if he's not insane, that psychologist put a lot of stuff on the record to show what a disturbed and difficult and socially out-of-it, unfortunate life he had. Yes, but what the psychologist didn't have were his first two years, and that evidence is very powerful evidence, that for his birth to this mentally retarded young woman who dies, you know, a couple of years after... See, I'm having a little trouble with that. I mean, not that it's not a terrible thing, but I'm having trouble understanding how that would tip the verdict or the judgment. Because, I mean, he still remains, he remains, you know, at 70 to 85 on his mental scale, whether his mother was retarded or disabled or not, and, you know, she died young. And how did that change things? Those facts supported additional cognitive impairments that Robert suffered from just a few days after, well, maybe a few weeks after birth. His treatment, being shuffled from foster home to foster home, going to his grandparents' home, he develops rickets. I mean, he barely survives his surrounding. And those were very critical facts to show how it was that Robert became so impaired, such that he... And that says that may be the cause, but the effect of it was already taken into account, wasn't it? I disagree. The one thing that Dr. Overbeck, the psychologist, the state's only, I mean, defense counsel's only expert, talked about was, I don't have these in-between years. And we know from the declarations that we've submitted, those in-between years are absolutely key to a child's ability to develop normally. So I, there's no question that that, those facts, and also, you know, the fact that he was able to survive, that trial counsel didn't, although he did obtain the very powerful mitigator, as you just said, he didn't advocate for it. He didn't, he certainly requested it, but he didn't explain to the judge, there's also, I also want to talk to you about the abuse. That is a huge mitigator, and he said nothing about it. I will reserve the rest of my time. Thank you very much. May it please the Court, I am John Todd, I represent the Respondent in this matter. First, in answer to Judge Schroeder's first question concerning the definition of prejudice in a cause and prejudice proceeding, I had cited in my brief Murray v. Carragher, which I believe talks about a higher standard than the Strickland standard. But our position is that they can't even meet the reasonable probability standard under Strickland. The, also I would point out that in the district court's order, ER, at ER 11 at page 5, the district court did note how they had, Moorman had attempted to expand the standard of the IAC claim and specifically found that it would not consider certain aspects that Moorman had presented because they had never been presented to the State court and believed that they were therefore procedurally defaulted. The Court is absolutely correct that the lens that this Court is looking at these events is through that of the appellate attorney. In other words, that in order to prevail, Moorman would have to establish that his claim is fundamentally ineffective for not raising the three claims that are in the COA. The State submits that had he raised these claims, there is no reasonable probability that the Arizona Supreme Court would have either reversed the conviction or the sentence. Now, any attorney is stuck with the facts and law that applies to his case. You know, some cases are better than others. In this particular, the facts and circumstances of this case, given Moorman's voluntary confession, the evidence that was discovered, all the circumstances surrounding the murder, defense counsel did have a tough case. Trial counsel did. The ---- Well, what about the, you know, the lesser included offense issue is bothersome because he has a client who he has to, in some belief, is incompetent at that stage because he's going to put on the insanity defense. He doesn't understand, the client doesn't understand his explanations or doesn't understand the consequences of various choices. And so he either accepts what the client says, which would seem to be unreasonable, or he makes a decision to just send down the river these lesser included offenses. That's a fairly troublesome strategic decision, if it is a strategic decision. When it could end him up with his only choice is insanity or death penalty eligible. Well, I think under the record, it's a reasonable decision. And it was reasonable for his appellate counsel not to raise it on appeal. And if he had raised it, the Arizona Supreme Court would not have reversed on it. And the reason for this is that, first of all, the ---- there's no question that Mr. Moorman had some mental impurities. In fact, the trial court found, as you've noted, G-1, which he had significant impurities, so that's very close. He was very close to being considered insane. So that was certainly a reasonable defense. The record is also unambiguous in that the day before they instructed the jury, they settled instructions. And at that time, the trial court told defense counsel he was inclined to give these two lesser included offense verdicts. And at that time, defense counsel said he was thinking of asking for them, but he wanted to talk to his client. There is no question on this record that after that proceeding, he did, in fact, talk to his client. In his 19 ---- excuse me, in his 2006 declaration, he doesn't recall the substance of the conversation. Mr. Moorman in the direct appeal didn't recall the substance of the conversation. But there's no question that they communicated. Well, they communicated, so he ---- so as a result, I talked to my nearly insane or possibly insane client. I said, well, what do you think about the lesser included offenses? Oh, I don't know, I don't think we ought to have them. Oh, okay, well, that's what you're left with. Well, no, Your Honor. Earlier in the declaration that he made in 2006, he stated that he made ultimately the decisions in the case, in the presentation of the evidence and so forth, that he ---- it was reasonable for him to talk to his client. Then after talking to him, he decided to go. I know, but it's a pretty ---- why not an evidentiary hearing on that? Because it's a pretty thin thing. Usually when people put these affidavits in, they'll say, okay, I made a strategic roll of the dice, and here was my calculus or whatever. Here, I don't really remember the conversation, but it was I personally strategically made this decision. And you say, well, and? And what was it? And so why would ---- why shouldn't there be at least an evidentiary hearing on that? Because the record is clear, and the evidentiary hearing isn't going to get you anything more. The ---- Was there a request for an evidentiary hearing on this point, on the ---- The no, there ---- I mean, at what point in the proceedings, Your Honor? On the ---- in the district court. In the district court, they did request at some point for ---- They did? Yes, for an evidentiary hearing. But ---- But was that with respect to all of the claims, or what ---- I think it was a ---- you know, I'm not sure. I think it was a general evidentiary hearing request. Was there any indication of what additional evidence would have been adduced vis-a-vis the attorney's strategy on this point? The ---- in 2006, the attorney says, I don't really remember what, you know, what happened. I just know it wasn't a strategic decision. Mormon, in 1985, didn't remember what happened, according to the direct appeal. So what we're left with is a very reasonable procedure where counsel is given the opportunity of asking for lesser-included offenses, he's considering it, he says, I want to talk to my client, he talks to his client, then he makes a decision which, it seems, a reasonable decision not to ask for them, given the evidence he was facing and given the chance of getting insanity verdict. And, of course, after the fact, he's motivated to get relief for his client from this death sentence. Right. Well, it's very odd, because he says, I don't ---- I didn't make a strategic decision not to request, correct? Right. He says, I, in 2006, doesn't remember what the conversation was, but he says, I know I didn't make a strategic decision. Right. And then if you look back at his conversation with the trial judge, it's a quite ---- it might be viewed as a little cagey. He says, okay, I went and talked to him and ---- let me go back, and he says something to the effect of, well, so we're fine with, you know, not pursuing that. He kind of uses the global we, but he doesn't really say. All he just says, well, that's the, you know, he says, I did discuss it, and it was agreed after speaking with him the course of action we took. Right. Yeah. So he ---- so I'm a little bit lost where he didn't make a strategic decision. So if he, the lawyer, didn't make a strategic decision, that means he relied solely on the client's view? I would not read it that way. Okay. But again, remember ---- How would you read it? I would read it that he consulted with his client, and after that consultation, in accordance with his prior first parties' declaration, either he had the understanding that he and his client agreed, that they wouldn't ask for it, or he made the decision himself. But I can't ---- But in any event, I take it your point is that by having an evidentiary hearing, now we aren't going to make very much, because nobody remembers exactly what happened anyway. Absolutely. Let me ask you this. On a ---- on the issue before us, which is, I guess, prejudice, whether the Arizona Supreme Court would have reversed the convictions or sentences if the Appellate Counsel had raised these three issues. Right. In addressing that issue, you would say? I would say there's no reasonable probability on this record that the Arizona Supreme Court would have reversed the conviction or the sentence had Appellate Counsel raised this lesser included ---- They have the jurors that say, you know, if I'd been given the choice, I would have, you know, gone that route. So that may go to prejudice. Well, you know, of course ---- Is that evidence that we can even consider? Absolutely not. It's improper to even have it as a declaration. Why is it improper? Because it's not impeaching the verdict. Well, it's not like a normal exclusion of juror testimony that we have. It seems to me that it is, in fact, impeaching the verdict, because they're saying, if we had this option, this is what we would have done without the opportunity to deliberate with the other jurors. And a minimum goes into the impressions of the jury and how they ---- their thinking process. Right. And it's years afterwards. And so it's totally unreliable, unfair, and improper. And it's certainly that was not before ---- that was not available to Appellate Counsel. He couldn't have raised that in the direct appeal. Counsel, somewhere in one iteration of this case, I remember reference to letters from family members regarding application of the death penalty or imposition of the death penalty. Do you recall where those are in this record, or was that in a prior record? I believe they're in my supplemental records for the first appeal. Oh, that's probably where I remember them from. Okay. What is the State's position with respect to the sexual ---- alleged sexual relationship between the victim and the defendant? The State's position is it's not a very credible allegation. If you carefully review the entire record, there ---- Was the State's position at trial that there was none? I don't know if the State had a position. I mean, Dr. Tuckler, who was the State's witness, said he believed it. He seemed to believe it. He believed it. Right. And I think Dr. Cleary was not sure, was somewhat ambivalent about it. But ---- The medical evidence seemed to undercut the defendant's position. Right. At least what happened in the hotel room. Right. And back at the time of the kidnapping, Mormon was claiming that he was impotent. The ---- his mother, you know, sent him to all these schools. Some of them, you know, private, you know, out of her control. So if she was concerned about, you know, him telling anybody, it just ---- if you look at the entire case carefully, it's a pretty outrageous allegation. So if ---- When you say it's an outrageous allegation, when you have some number of these people, you know, they've seen ---- they've kind of seen it all. Well, but ---- And they don't discount him in terms of now ---- he doesn't need to be sexually abused by his mother. He doesn't need to have actually been having sex with her at the time of the murder. Right. In fact, the addendum he filed with the pre-sentence report, he came up with a different story as to how the murder happened that didn't involve sex. The ---- I did have another point that I've forgotten on the evidence concerning any sexual impropriety. Well, the thing in front, I mean, I have to just say as an Arizonan, if I had a 72-hour furlough from Florence, I wouldn't go to a motel across the street. Right. But this is ---- The circumstances are ---- I guess she didn't have a car. You know, a 74-year-old mother who's like 5 feet 11 inches, not 5 feet 11, no, tiny. It ---- anyhow, the ---- Well, some of the evidence did ---- I mean, that evidence did come in. Yes. And so my question to you is if, I mean, what would be the effect of having more corroboration of that evidence? I mean, how would it have affected the trial or the sentence? I don't know how it would have any effect on the guilt or innocence verdict. And given the G-1 finding, I don't think it would have any effect on the sentence. I mean, they argued it, I thought, in the briefs as kind of an additional nonstatutory mitigating factor. He doesn't mention that. The trial judge didn't mention that. But he also didn't mention a bunch of other things, like whether he was a model prisoner or not. Right. But this ---- and this Court found that he considered everything that was before him. The thing I guess I was going to mention was, from the record, it's very clear that Mr. Mormon is a prevaricator. The ---- he, during the course of the district court proceeding, he in fact voluntarily ---- it's part of this record. In fact, it's in the old SERs ---- filed a letter with the court asking to withdraw his appeals and saying that he lied all this time about sexually ---- his mother sexually abusing him. And he ---- he admitted or he claims in this letter at that point in time that he ---- this was all made up. And if you look through the record carefully, the only source of this information is his repeated statements. There is no cooperative information other than suspicions. Kagan. Let's just stop there. Well, there are some suspicions. For example, no contact belief. I mean, if you have a dead mother and a defendant, and the question is, was there inappropriate sexual contact between the two, one ---- this is, like, almost impossible to get extrinsic evidence, is it not? Well, there could be semen, there could be ---- Well, I don't mean at the time of the murder, but, I mean, in general, it's not ---- this is not exactly where you get eyewitness testimony. No, that's very true. I mean, that is very true. And the fact that it never came to the attention of the authorities, the fact that he had all these different placements. No teacher reports of sexual abuse. Right. No doctor reports that there was indication. Right. There was inappropriate sexual behavior on the part of the child, things like that, that normally come to light if there's sexual abuse of a child. Right. And what we do know is that at gunpoint, he kidnapped a young 8-year-old girl, sexually abused her, that his minimum sentence was up in 75. He was paroled in 78, I believe. His parole was revoked, among other things, for possessing a gun. Now he goes out and, on furlough, murders his 74-year-old mother, the sexer, tries to hide her identity, carefully getting rid of the things that could identify her. Pretty strong circumstances. In the — in my supplemental authority, I mentioned two of those per curiam decisions from the U.S. Supreme Court. And just, you know, you can look at cases and you can distinguish them. There's different facts and so forth. But one sentence in the Belmontes case, the Supreme Court per curiam says, it is hard to imagine expert testimony and additional facts about Belmontes' difficult childhood outweighing the facts of McConnell's murder. I think that you could just change the wording of that sentence and apply it to this case. Would you comment on the relevance of the confession in all of this? The relevance? Yeah. The confession is — was found to be voluntary. It's Mormon's tape-recorded statement of how he stated the murder occurred. Does it bear — how does it bear, if at all, on the question of whether it was reasonable not to go for lesser-included? Well, I think in light of his confession, the facts he talks about in his confession, tying his mother up, that the attorney would — that his best defense was insanity. And it was reasonable not to dilute that defense by asking for these lessers. But the jury wouldn't know that he asked for those. That would just be the judge giving the instruction. Certainly. Certainly, Your Honor. But I didn't mean — I — he would want — it seems reasonable to me. He wouldn't want the judge to give the instruction. Right. Why not? I mean, what's reasonable about that? Because he could get a not guilty verdict, whereas if he instructed on the lesser-included, well, then he might get — Were they inconsistent? Were they insanity and — And the lesser-included? I don't — I really haven't thought about that, Your Honor. Well, I have. And that's why I wondered — that's why it's troubling to me — it seems to me important as to the strength of the premeditation evidence. Right. Because insanity, if you have very strong evidence of premeditation, it's pretty hard to get a lesser-included. And the insanity would be a defense that could account for all of that. Right. Which is very weird behavior. Right. You would have to somehow stand up before the jury and explain, on the one hand, the insanity, which could take care of the premeditation. On the other hand, try to talk them into something less with the lesser-included. Well, he wouldn't have to necessarily argue for the lesser-included. He could just say the judge is going to instruct you that these offenses are lesser-included. If you find that he wasn't insane, then under the judge's instruction, you consider the lesser-included offenses. So why wouldn't that negate any argument that there was a good strategy to — to leave out those lesser-included offenses, a reasonable strategy? That — the Court is absolutely correct that he could have done that. And we're now, over a quarter-century, second-guess the decision that he made over a night. But I think it was also — But try to determine if it's a reasonable decision under the law. Right. But I think that it was what the decision he did make was, in fact, reasonable. Well, it's not his decision, I guess. It's the appellate counsel's decision, so he's getting a little — Well, it was — his decision first was reasonable. Right. And it was reasonable for appellate counsel not to raise it, because it was reasonable. Right. Right. Right. We're looking at it another way. If you had any possibility, I mean, why wouldn't it be reasonable? You had a trial judge who says, look, this is what we normally would do. We would give both of these alternate defenses. I'm asking you if you want it. Then there's — you know, he talks to his client who can't get a straight answer out of one way or the other, either because of his mental capacity or, as you suggest, because he doesn't tell the truth. So in a way, to determine whether appellate counsel was reasonable, if you had any possibility of showing prejudice from that, why would you — why wouldn't it be unreasonable not to raise it on appeal? Again, we're — we have lots of years of hindsight, and we've been over this case a lot. You don't need to do that. I think the — I think the other issues that he raised were just as reasonable and would have gone to the conviction, would have — I — it's just — What about the prejudice? What about the prejudice of failing to address this issue? Would it have made a difference reasonably in the outcome, in your view? No, Your Honor, not in my view. Why not? There's no reasonable probability that, had he raised it, that the Supreme Court would have, in fact, reversed the convictions on it. Why not? As an IAC can — Well, that's the ultimate question here, isn't it? And why not? Right. Because it was just as reasonable not to ask for them. And so it was reasonable for the — Right. But, you know, these kind of abstractions, and I realize we're dealing with multiple layers, if you're — instead, if you really go back to where it counts in the trial court, you roll the dice with the insanity, if you don't win that, but you have some alternatives for the jury, they don't have any alternative as they're going in now. It's either insanity, you know, yes or no. Right. And once they say no, then basically they're down the road with the merit. Correct, Your Honor. But we have all sorts of cases where defense attorneys often don't ask for a lesser-included offense because they want to put the jury to the yes-or-no test. They want to avoid the compromise verdict. Right. Right. But of course, there, you know, that's true sometimes when, you know, you've got a guy who's already in jail up to life here, and so, you know, he's got that possibility. And isn't this a little bit different, too, because, you know, you have an argument on one juror to tip your case, so to speak, on a premeditated matter? You don't have, in my view of the record, you don't have a very good argument on avoiding the premeditation part of the case. I mean, we're speculating as to what this attorney thought over that night and whether that was reasonable, and the appellate attorney, whether it was reasonable for him not to look at that issue and look at these others. You know, this gets to be very confusing, because if you look at this case, it's  If you look at the Supreme Court's decision, the question of lesser includance was raised. Yes. And the Supreme Court goes through this business of the mormon's attorney saying he and his client had discussed the matter and decided they wanted the jury instructed only on first degree, and then on the appeal, he says, well, there wasn't any, he doesn't remember the conversation. And then the Supreme Court goes on and says, we don't need to decide whether they discussed it or not, because we just assumed that he waived it. Well, he did waive it because his attorney didn't make the decision or decided to do it. And apparently, the decision not to request instructions on second degree was strategic. But it's very hard for us to see what that strategic reason was here. That's a – that's a – I think that's a problem. Do you have an answer for that now? The only answer I have is not to ask for it seems reasonable if you want to put the jury to a test. Thank you. In my quick time left, the – the two defenses, I just want to be clear if I misspoke earlier, of insanity and lesser included were not mutually exclusive. They obviously both – No, no. Okay, they obviously both could have worked. And particularly when you look at the State's expert, Dr. Tukor, who said this crime was impulsive, he interviews him and testifies, this crime was impulsive and it was an accident. So there clearly was plenty of evidence to support that. And the other point I wanted to make on the sentencing claim is none – again, none of the experts were ever asked to look at mitigation. And the – the mitigation that we were able to uncover in the proceedings below showed a slew of available non-expert witnesses who could – What were they going to put in the record that wasn't already before the court? The court had the – had heard a lot of this in the – in the trial. There was all kinds of material there. There were letters from teachers, all kinds of stuff. What – what was there that wasn't there? It's – It would be a witness. It – again, I know – I know it's judge sentencing, but it still should be an advocacy setting, an advocacy proceeding. So to have the judge be able to hear these witnesses, he called nobody other than these two prison employees to bring in these witnesses, have the judge hear them, and then assess their credibility. And again, these witnesses predated all of this crime, and they would have testified about the bizarre behavior of the victim, in this case, in her relationship with Robert. Again, it would have all gone to just give that extra evidence that was needed here to show that what Robert had been saying about his mother all along, and his counsel decided it was a delusion, and in fact, that was his defense, was not a delusion. Thank you very much. Thank you. The matter just argued is submitted for decision, and that concludes the Court's calendar for this afternoon. The Court stands adjourned.
judges: Schroeder, McKeown, Rawlinson